IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM CARL SOUDER, JR. | ) | 1:08CR136-1 |
| MARVIN DEAN CHAMBERS, SR. | ) | 1:08CR136-2 |
| ALVIN LEWIS ELLIOTT, SR. | ) | 1:08CR136-3 |
| _____ | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM CARL SOUDER, JR. | ) | 1:08CR275-1 |
| MARVIN DEAN CHAMBERS, SR. | ) | 1:08CR275-2 |
| ALVIN LEWIS ELLIOTT, SR. | ) | 1:08CR275-3 |
| JOHN HENRY WILCHER | ) | 1:08CR275-4 |

<u>MEMORANDUM OPINION</u>

BEATY, Chief District Judge.

      This matter is before the Court on Defendants William Carl Souder ("Souder"), Marvin

Dean Chambers ("Chambers"), and Alvin Lewis Elliott's ("Elliott") (collectively "Defendants")

Joint Motion for Judgment of Acquittal or Motion for a New Trial [1:08CR136: Doc. #88;

1:08CR275: Doc. #112]. The Defendants filed their Motion pursuant to Rule 29 and Rule 33

of the Federal Rules of Criminal Procedure. A hearing was held on the Motion on July 31, 2009.

For the reasons stated below, Defendants' Motion for Acquittal pursuant to Rule 29 is granted,

and Defendants' Motion for a New Trial pursuant to Rule 33 is conditionally granted.

I.    FACTUAL BACKGROUND

The evidence presented at trial relevant to the Defendants' Motion is as follows.  During the relevant time period in this case, that is, the years 2001 through 2003, Defendants Chambers and Elliott were leaders of the Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of North Carolina and Jurisdiction, Inc. (the "Grand Lodge"), which is a fraternal organization of men whose members are called Masons.  Defendants Chambers and Elliott served as the Grand Master and the Grand Secretary, respectively.  The membership, which fluctuates annually between 13,000 and 18,000 members, is organized throughout the state of North Carolina into approximately 304 subordinate local lodges housed within thirty-seven districts.  With respect to its operation, the Grand Lodge has a long-standing tradition of offering a Benevolence Program to its members who are under the age of 55 when they become Masons.  In addition to age limits, a member may also be excluded from the Benevolence Program if upon physical examination a doctor considered him to be "a risk."  The member would pay $12.00 in annual dues that would go towards the Benevolence Program, and upon his death, his named beneficiary would receive a $500.00 death benefit.

Earlier, when Defendant Chambers was elected Grand Master of the Grand Lodge, in 1998, he began to seek out ideas and methods to provide a death benefit for members that were excluded from the Benevolence Program, and to enhance the death benefit for those that were already part of the program.  Upon meeting Defendant John Henry Wilcher, who was an insurance agent and owner of the Wilcher Group, the two discussed the possibility of an insurance program that could provide the benefits that Defendant Chambers was seeking for

2

the members of the Grand Lodge. Defendants Chambers and Wilcher initially met at a Masonic event held outside of North Carolina in May or June of 2001. After further discussion about a potential insurance program for the Grand Lodge members, Defendant Wilcher made a presentation to the executive committee of the Grand Lodge in late 2001. Apparently, there was no immediate acceptance of Wilcher's proposal. As a result, Defendant Wilcher sought out Defendant Souder, who was then the president of Atlanta Life General Agency ("Atlanta Life"), as a potential partner with the Wilcher Group and the Grand Lodge in the development of an insurance program for the Grand Lodge members. Thereafter, Defendants Chambers and Souder met at the Atlanta Life headquarters in Atlanta to discuss the development of an insurance program. Over the course of several meetings in Atlanta, which included Defendants Elliott, Wilcher and Souder, and others from Atlanta Life, Defendant Chambers conveyed to them that his requirements for the potential insurance program were that the Grand Lodge would provide a whole life insurance policy for all of its members, that the policies would be owned by the Grand Lodge, that the Grand Lodge would pay a portion of the insured member's premium, that the member's named beneficiary would receive a $10,000 death benefit, that members would be able to participate in the program without having to take a physical, and that each member would pay the same amount to participate. Defendant Chambers wanted a whole life policy with the Grand Lodge as owner so that the Grand Lodge could eventually receive a return on its "investment" because it was paying a substantial portion of the quarterly premium payments. With this information, Defendant Souder researched insurance companies that would be willing to underwrite the type of policy that Defendant Chambers envisioned for the Grand

3

Lodge members. Thereafter, but prior to May 25, 2002, Presidential Life Insurance Company committed to underwriting $10,000 graded death benefit life insurance policies for members between the ages of 65 and 75. Under these $10,000 policies, the insured member would pay $22.00 of dues per month towards the premium for the policy. The Grand Lodge would then supplement the dues payment in order to equal the full premium payment, and then forward the premium payment to Presidential Life. The Grand Lodge would be the owner of the policy, however, the insured would have the right to name the beneficiary for the $10,000 in death benefits. The Presidential Life whole life policies did not require the member to take a physical exam. This policy then became the North Carolina Mason Supplemental Insurance Program (the "Program").

Thereafter, Defendant Chambers called a Special Session meeting on May 25, 2002, to present the Program, as it existed at the time, to the Grand Lodge's regional directors, deputy wardens, and others in the general membership. Many of the 200 to 300 members present were there in a representative capacity, sent to bring information about the Program back to their respective regions and local lodges. At the meeting, Defendants Chambers and Souder made presentations and answered questions regarding the aforementioned details of the Program. In addition, the members were told that the Grand Lodge would be paying the total first quarter of premiums for all members that applied, using those members' then existing benevolence program funds. It was anticipated that thereafter, the Grand Lodge's contribution towards the premium payments would be $3.00 per week. The members were instructed that they would be able to sign up for the Program at a later date by agents of Atlanta Life.

4

However, another component of the Program was added after the initial May 25, 2002 meeting. Prior to May 25, 2002, Defendant Souder was contacted by Jayne Silven of American Heritage Life Insurance Company ("American Heritage"), a subsidiary of Allstate, who was informed by her superiors that Souder was partnering with a large group of potential insureds, and was in need of an underwriter for a proposed insurance program. Defendant Souder and Ms. Silven first communicated on numerous occasions via telephone and email, and then on May 29, 2002, they had an initial meeting with other executives from American Heritage. On June 4, 2002, American Heritage committed to underwriting an insurance program for the Grand Lodge with the following components: the insured member would pay $22.00 per month in dues, with the Grand Lodge paying the balance of any premium due each billing period; the Grand Lodge would be the owner of each individual policy issued; $25,000 face amount policies would be available for those aged 65 and under, for which the primary beneficiary would be the Grand Lodge at 50 percent and an irrevocable beneficiary named by the insured would also receive a 50 percent share of the total death benefits; and a $10,000 face amount policy would be available for those aged 65 through 75, but they would have been required to undergo a para-medical exam. With respect to the American Heritage $10,000 policies, the primary beneficiary would be an irrevocable beneficiary named by the insured who would be entitled to 100 percent ownership of any death proceeds. With the addition of the two American Heritage policies, as of June 4, 2002, the Program had three policy options for its members: the $10,000 Presidential Life policy, available to members aged 65 to 75, for which the primary beneficiary would be named by the insured at 100 percent; the $10,000 American Heritage policy, available to

5

members aged 65 to 75, who would be subject to a para-medical exam, for which the primary beneficiary would be named by the insured at 100 percent; and, the $25,000 American Heritage policy, available to members aged 65 and under, for which the primary beneficiaries would be the Grand Lodge at 50 percent and an irrevocable beneficiary to be named by the insured with a 50 percent interest in the death benefits.

On June 10, 2002, Atlanta Life General Agency held an initial teleconference training in which the insurance agents for Atlanta Life were given details about the Program and instructions regarding the completion of applications for the three policy options in the Program. At some point prior to December 6, 2002, the benefit structure of the $25,000 American Heritage policies was changed from a 50/50 split between the Grand Lodge and the insured member's named beneficiary, to a benefit structure with the Grand Lodge as primary beneficiary at 60 percent ($15,000), and the beneficiary named by the insured with a 40 percent share ($10,000), in order to properly reflect the $10,000 benevolence death benefit that the Grand Lodge wanted the members to have. Thereafter, the agents from Atlanta Life General Agency continued to sell life insurance policies as designed under the Program to the members until November 3, 2003 when the incoming Grand Master, Milton Fitch, who succeeded Defendant Chambers as Grand Master, cancelled the entire Program as envisioned by Defendant Chambers.

On April 29, 2008, the Grand Jury returned an indictment in case number 1:08CR136 charging Defendants Souder, Chambers, and Elliott with nine counts each of mail fraud or aiding and abetting mail fraud in violation of 18 U.S.C. § 1341 and § 2, in relation to the

6

development and implementation of the Program.  Thereafter, on July 29, 2008, the Grand Jury returned an indictment in case number 1:08CR275 charging Defendants Souder, Chambers, Elliott, and Wilcher with four counts each of mail fraud and "honest services" mail fraud or aiding and abetting the same, in violation of 18 U.S.C. §§ 1341 and 1346 and § 2, in relation to the development and implementation of the Program.  The two cases were joined for trial on September 4, 2008.  A joint trial commenced on June 29, 2009 and concluded on July 23, 2009 when the Jury returned verdicts of guilty on all counts as to Defendants Souder, Chambers and Elliott in case number 1:08CR136 and case number 1:08CR275.  With respect to the convictions in case number 1:08CR275, the Jury found by special verdict that the Defendants were guilty only of "honest services" mail fraud.  The Jury acquitted Defendant Wilcher in case number 1:08CR275 on all counts.  After the Jury returned the verdicts, the Court instructed the parties to submit briefs addressing the parties' contentions and issues with respect to any Rule 29 motions for acquittal, and scheduled a hearing.

After a review of the parties' briefs and the hearing on this matter, the Court notes that Defendants now contend that, pursuant to Rule 29, the evidence as presented at trial was insufficient to permit a jury to convict them of mail fraud in both case number 1:08CR136 and case number 1:08CR275, and further that, pursuant to Rule 33, a new trial should be granted in the interest of justice and because the evidence weighs heavily against the verdicts.  With regard to Defendants' Rule 29 Motion, Defendants primarily contend that the Government has failed to produce sufficient evidence of a scheme or artifice to defraud, or that any of the Defendants acted with the specific intent to defraud.  Moreover, with respect to Defendants' Rule 33

7

Motion, in addition to the issues raised in their Rule 29 Motion with regard to the sufficiency of the evidence, Defendants also contend that the Court should have given the jury Defendants' proposed instruction as to certain aspects of "honest services" mail fraud. The Government, in response, contends that it has presented substantial evidence to support the verdicts of the Jury. In light of the differing legal standards which govern the Court's determination of Rule 29 and Rule 33 motions, the Court will discuss in turn Defendants' Motions.

## II.     RULE 29 MOTION

### A.     Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure provides that a court may enter a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). In evaluating the sufficiency of the evidence, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support [the convictions]." United States v. Cameron, 573 F.3d 179, 183 (4th Cir. 2009) (internal quotation and citation omitted). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. Moreover, "if the record reflects that the Government presented substantial evidence from which a reasonable jury could convict, [the court] must uphold the verdict." United States v. Curry, 461 F.3d 452, 457 (4th Cir. 2006) (quotation and citation omitted). Thus, the Court must sustain the jury's verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

United States v. Myers, 280 F.3d 407, 415 (4th Cir. 2002). In making its determination, the Court considers both direct and circumstantial evidence, allowing "the government the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). In assessing whether there is substantial evidence in the record to support each of the essential elements of the offenses for which the Defendants have been convicted, the Court turns first to the elements of mail fraud.

B.    Analysis

i.    Case Number 1:08CR136

With respect to case number 1:08CR136, the Indictment charges the Defendants with mail fraud in violation of 18 U.S.C. § 1341. The offense of mail fraud has "two essential elements: (1) the existence of a scheme to defraud and (2) the use of the mails . . . in furtherance of the scheme."[1] Curry, 461 F.3d at 457. In addition, the scheme or artifice to defraud must employ some material misrepresentation or concealment of fact. See, e.g., United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008). With regard to the fraud, "[e]ven in the absence of a fiduciary, statutory, or other independent legal duty to disclose material information, common-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information." United States v. Gray, 405 F.3d 227, 235 (4th Cir. 2005) (internal quotation and citation omitted). "Although simple

---

[1] The mail fraud statute, 18 U.S.C. § 1341, provides in part that: "[w]hoever, having devised or intending to devise any scheme or artifice to defraud . . . and for the purpose of executing such scheme or artifice or attempting to do so . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service" shall be guilty of an offense against the United States.

9

nondisclosure generally is not sufficient to constitute fraud, the Supreme Court has noted that 'mere silence is quite different from concealment,' and in some cases 'a suppression of the truth may amount to a suggestion of falsehood.'" Id. at 235-36 (quoting Stewart v. Wyoming Cattle Ranche Co., 128 U.S. 383, 388, 9. S. Ct. 101, 32 L. Ed. 439 (1888)). Thus, the Fourth Circuit has stated that "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter may constitute fraud." Id. at 236. Moreover, with respect to the scheme or artifice to defraud, "the jury must find that a defendant acted with [the] specific intent to defraud." United States v. Ham, 998 F.2d 1247, 1254 (4th Cir. 1993). "Fraudulent intent may be inferred from the totality of the circumstances and need not be proven by direct evidence." Id. In addition, "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" United States v. Coyle, 943 F.2d 424, 427 (4th Cir. 1991) (internal quotation and citation omitted).

In support of their Rule 29 Motion, Defendants contend that the Government has failed to produce substantial evidence of the existence of a scheme or artifice to defraud, or that any of the Defendants acted with the specific intent to defraud with regard to any purported scheme. Specifically, with respect to the existence of a scheme or artifice to defraud, Defendants contend that the Government has failed to present substantial evidence that Defendants made any material misrepresentations or omissions with regard to the Program in order to support a jury finding as to this essential element of mail fraud. In this regard, the Government has alleged in the indictment and argued at trial that Defendants devised a scheme and artifice to defraud the

10

Prince Hall Lodge and its members by creating a life insurance program for the members, whereby the Grand Lodge would receive a $15,000 death benefit from any $25,000 policy insuring the life of the member, all without the knowledge or consent of the member who purchased the insurance. The Government further alleged that in executing this scheme or artifice to defraud, Defendants made material false statements and omitted material information, namely: 1) that the Program would provide members with up to $10,000 of life insurance while omitting to inform the members that some would be eligible and insured for $25,000 with the Grand Lodge receiving a $15,000 death benefit from the policy; 2) that the Grand Lodge would not benefit from the Program; 3) that Defendant Souder instructed the insurance agents selling the insurance to the members to leave the 'amount of insurance' and 'primary beneficiary' sections blank on the insurance applications, and later directed the agents to complete these sections with '$25,000' and "Prince Hall Lodge"; and, 4) that Defendants created 'false and fraudulent' certificates of insurance to be mailed to the insured members to further conceal the actual policy amount, the policy number, and the beneficiary. The Government has alleged that all of these acts together were orchestrated to deceive the members with respect to the Grand Lodge receiving a $15,000 benefit from a member's $25,000 life insurance policy. However, Defendants contend that based on the evidence presented, any purported misrepresentations were in fact true statements at the time that they were made due to the date that the $25,000 insurance policies became part of the Program, and that Defendants did not seek to hide from the members the fact that the $25,000 policies were split benefit policies wherein the Grand Lodge would receive a $15,000 death benefit.

11

In this case, the evidence presented at trial established that during the May 25, 2002 Special Session meeting at the Grand Lodge which was called specifically to address the Program, Defendants Souder and Chambers provided information to the members both via presentation and direct question-and-answer. Defendant Elliott was present at the meeting but did not address the members. The evidence of material misrepresentations or omissions that the Government points to include Defendant Chambers' statement at the meeting that "the Grand Lodge is not getting anything," and that in reviewing the Program, Defendants did not discuss the $25,000 insurance policies from which the Grand Lodge would receive a $15,000 death benefit. However, the evidence presented at trial also established that the agreement with American Heritage, by which the members would be able to purchase the $25,000 life insurance policies, had not yet been entered into on May 25, 2002, when the Special Session was held. The negotiations between Atlanta Life and American Heritage regarding the $25,000 life insurance policy were not complete until June 4, 2002. Moreover, the tape recording of the meeting reveals that Defendant Chambers' statement, "the Grand Lodge is not getting anything," was made in the context of a discussion regarding the responsibility of premium payments to the insurance company as between the Grand Lodge and the insured member.[2] In this regard, the Court finds that while on May 25, 2002, Defendants had knowledge of the possibility of implementing a $25,000 insurance program whereby the Grand Lodge would receive a $15,000 death benefit, the only plan that the Grand Lodge had in place was the $10,000 life insurance

_____

[2] The evidence established that the insured member would pay monthly "dues" to the Grand Lodge, and the Grand Lodge would then supplement the dues in an amount equal to the total premium payment for the insured member, and then the Grand Lodge would forward the premium payment to the insurance company.

program with Presidential Life, and therefore, the fact that Defendants did not discuss the details of the $25,000 policy was not an omission of a material fact. Moreover, because the $25,000 insurance plan was not yet in place, the statement that "the Grand Lodge is not getting anything" was accurate at the time that it was made, in that the Grand Lodge would not be receiving any death benefit from the $10,000 policies that were the subject of the May 25, 2002 meeting. In this regard, the Court finds that Defendant Chambers' statement was not a material misrepresentation nor was it made in order to induce members to purchase $25,000 life insurance policies because those policies were not available for purchase at the time. Having found that there was no evidence of any misrepresentation or omission made at the May 25, 2002 meeting with respect to the scheme to defraud as alleged by the Government, the Court turns to the evidence regarding the events the occurred after the May 25, 2002 meeting.

The evidence, as presented at trial, established that after June 4, 2002, when the $25,000 insurance policy became effective, numerous regional and local lodge meetings were held around the state to introduce the members to the Program, which then included the $10,000 policies, as well as the $25,000 policy. The evidence shows that there was not another meeting held by Defendant Chambers or the Grand Lodge to discuss the Program.[3] The Government did not present evidence of any misrepresentation that was made by, or could be attributed to, any of the Defendants at these regional and local meetings with regard to the $15,000 death benefit that the Grand Lodge would receive from the $25,000 life insurance policies. Rather, the

---

[3] The Court notes that the Government did not argue nor present any evidence with respect to any of the Defendants having any fiduciary, statutory, or other independent legal duty to hold another Grand Lodge meeting to discuss the new addition to the Program.

13

Government presented the testimony of witnesses that attended the various meeting at which the Program was presented or discussed to demonstrate omissions of material fact. The Government's contention is that at these meetings, the members were not informed that $25,000 policies with a split benefit provision were offered as part of the Program. In this regard, the Court notes that the evidence is that of the thirteen Masons that the Government called to testify about their knowledge of the Program, seven attended only the Grand Lodge meeting, five attended only a local lodge meeting, two attended both a local lodge meeting and the Grand Lodge meeting, and one was unsure of where he attended meetings. Three of the witnesses that the Government called testified that they had knowledge that the Program offered $25,000 policies and/or that those policies had a split benefit provision or that some portion of the death benefit was to go to the Grand Lodge. All three of these witnesses attended only local lodge meetings. Morever, the Defendants presented evidence of four additional Masons that participated in the Program and testified that they were aware of the $25,000 split benefit policies or that the Grand Lodge would be receiving some death benefit from the policies. These witnesses also attended local lodge meetings. In addition, the evidence presented established that the members received information regarding the details of the Program at the regional and local lodge meetings from a combination of sources including the insurance agents, district deputies, and local lodge leaders. Finally, the evidence established that the agents were instructed to have the applicants complete a "Required Disclosure Statement for Accelerated Benefit Rider" with each application that the member may qualify for a $25,000 policy. The Rider states that the minimum face amount of the policy that it may be attached to is $25,000.

14

In addition, it was shown that a Rider was signed as part of the application by all but two of the Government's Mason witnesses that participated in the program and completed applications.[4] Defendants contend that this is evidence of the fact that there was widespread knowledge among the members of the Grand Lodge's offering of $25,000 policies under the Program for those who were eligible.

In this case, the Court finds that in viewing all of the evidence above in the light most favorable to the Government, the evidence shows that some members were indeed aware, either prior to or at the time they signed up for the Program, of the $25,000 policies with the split benefit provision, and that the Grand Lodge was to receive a $15,000 death benefit or some other portion of death benefit from the policies. In addition, since only 200 to 300 of the members attended the Grand Lodge meeting on May 25, 2002, the majority of the approximately 13,000 members would have attended or learned of the Program either at a regional or local lodge meeting. Morever, the evidence shows that witnesses who testified that they had knowledge of the $25,000 or the split benefit were those that attended the local or regional meetings. Also, the fact that the $25,000 applications included a Rider, signed by the applicants, which stated that the document could not be attached to a policy that was less than $25,000, contradicts the notion that Defendants sought to conceal information with regard to the face amount of the policies. In this regard, the evidence does not support the Government's

---

[4] The Court notes that one such witness, Jackie Robinson, testified that although the Rider was dated on the same day he completed his application, the signature on the Rider was not his own. It is also noteworthy for the Court that although the Riders were a part of the complete application package, it was the Defendants and not the Government that disclosed their existence.

15

contention that omissions of material fact, namely the existence of the $25,000 policies and the split benefit provision, were made in order to induce members to participate in the Program, even after the $25,000 program became effective on June 4, 2002.[5]

The Government, however, also alleged that Defendants made omissions of material fact in that Defendant Souder instructed the insurance agents selling the insurance to the members to leave blank the 'amount of insurance' and 'primary beneficiary' sections on the insurance applications, and that he later directed the agents to complete these sections with '$25,000' and "Prince Hall Lodge." However, there was no evidence presented by the Government that Defendant Souder instructed the insurance agents as alleged. The evidence presented at trial demonstrated that Defendant Souder neither trained nor instructed the insurance agents, but rather, Atlanta Life's director of training, Gloria Giles and Dave Geerish, an executive from Allstate, conducted the training for completing the $25,000 insurance policy applications. Moreover, the evidence established that the agents were instructed by Ms. Giles to leave the 'amount of insurance' section blank, because even though the insured member's beneficiary would receive a $10,000 death benefit in any event, the actual amount of coverage could only be determined by the appropriate insurance company upon review of the complete application.

---

[5] The Government argued at trial that Defendant Chambers made omissions of material fact when he met with the Eastern Stars organization on June 15, 2002 to address them about participation in the Program, in that he failed to disclose to them the $25,000 split benefit policy wherein the Grand Lodge would receive a $15,000 death benefit. However, the Government has presented no evidence with regard to the date that Defendant Chambers became aware of the approval of the $25,000 program such that his failure to mention it to the Eastern Stars at their meeting was a knowing omission of material fact. In this regard, the evidence does not support a finding that Defendant Chambers made an omission of material fact at the Eastern Stars meeting as alleged by the Government.

In addition, the evidence is that at the first agent training meeting on June 10, 2002, the agents were instructed that the 'first beneficiary' section was to be completed as determined by the insured member, and the 'second beneficiary' section was to be completed with "the name of the state lodge." In light of the above evidence presented at trial, the evidence does not support a finding that Defendant Souder directed the agents selling the $25,000 insurance policies to the members to make omissions of material fact with respect to completing the insurance applications as alleged by the Government.

The Government, in addition, alleged that Defendants made material misrepresentations and omissions in creating and mailing to insured members "false and fraudulent" certificates of insurance to further conceal the actual policy amount, the policy number, and that the Grand Lodge was a beneficiary. The evidence presented at trial established that the Grand Lodge issued a purported certificate of insurance to members "summarizing certain provisions of the Policy," specifically listing the insured member's name, and indicating that a $10,000 death benefit would be paid out to the member's designated beneficiary. These documents further indicated that they were being issued subject to the terms of the life insurance policy issued by the named insurance carrier, and lists as the payment required from the members as "dues payable: $22.00 per month." The policy number listed on the certificate referred to the case number issued by the insurance company which, in turn, references the Grand Lodge as the policyholder. The certificates were signed by Defendant Chambers in his capacity as Grand Master, and by Defendant Elliott in his capacity as Grand Secretary. There was no evidence presented that either of them represented in any manner that they were signing the documents

17

as agents or representatives of any insurance agency or company. However, the Government contends that the certificates do not refer to the instances where the Grand Lodge would receive a $15, 000 death benefit.

Defendants' evidence is that there was never an intent by any of the Defendants to create a certificate of insurance as if it were being formally issued to the members by an insurance company. Rather, the evidence is that Defendant Chambers made a request that some kind of "certificate" be created to send to the members with $10,000 and $25,000 policies in order to provide them with proof that they were indeed insured and that their named beneficiary would indeed receive a $10,000 death benefit. When instructed by Defendant Souder to try to help Defendant Chambers with his request, Ms. Giles was the person who created the "certificates of insurance" for the Program by using as a model an actual "certificate of insurance" that had previously been issued to her by an insurance company. In addition, Defendant Chambers testified that he wanted the "certificate" to serve as proof to the members of their death's benefit because the Grand Lodge would in fact be the owner and custodian of the insurance policy. Finally, while the evidence established that it was otherwise illegal for insurance companies to issue certificates of insurance to insureds without prior approval of the state Insurance Commission, the certificates in this instance were issued by the Grand Lodge and signed by the Grand Lodge leadership solely to reflect the relationship between the Grand Lodge and its members and not for the purpose of creating an insurance document that would have required the approval of the state Insurance Commission.

In light of the above evidence, the Court finds that the information contained in the

certificates is correct and accurately represents the information that had been conveyed to the members, that is, that the Grand Lodge would be the owner of the policies, that the member was insured, that the member's designated beneficiary would receive a $10,000 death benefit, and that the member was required to pay dues of $22.00 per month. Moreover, in any event, the certificates were created after the insured members had applied for the insurance policy, therefore the certificate could not have been issued to induce the member to purchase the insurance. See Neder v. United States, 527 U.S. 1, 25, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (noting that a misrepresentation or omission is material if it has "a natural tendency to influence, or is capable of influencing, the decision of the [person or] decisionmaking body to which it was addressed"). The Government, however, contends that an inference can be drawn that since the Defendants previously made misrepresentations or concealed information regarding the Grand Lodge's $15,000 death benefit in order to induce the members to purchase insurance, the Defendants then used the certificates to further prevent the discovery of the $15,000 death benefit. However, as noted above, the evidence established at trial is that no misrepresentations or omissions were made or directed to be made by Defendants with regard to the death benefit to the Grand Lodge upon which to base such an inference. Thus, the Court finds that making such an inference is unreasonable in light of the facts presented. See United States v. Grow, 394 F.2d 182, 199 (4th Cir. 1968) (noting that "[a]n inference is a logical deduction or conclusion from established fact. . . . When the first or basic inference is impermissibly drawn it cannot thereafter serve to support other inferences upon which a subsequent finding is based" in finding that a purported inference was wholly unsupported by the evidence); see also, Tresvant,

677 F.2d at 1021 (noting that the government is only allowed "the benefit of all reasonable inferences from the facts proven to those sought to be established"). In this regard, the Court finds that the certificates contain neither material misrepresentations nor omissions of material fact.

Having found that the Government has not presented substantial evidence of any material misrepresentation or omission of material fact made by Defendants with regard to or in furtherance of a scheme to defraud the Grand Lodge and its members by concealing the existence of the $25,000 policies and the Grand Lodge as a primary beneficiary at $15,000, the Court further finds that while the Defendants' actions with regard to the dissemination of information to the members about the Program were perhaps poorly executed, they were not evidence of calculated acts to create a false impression or to deceive the members with regard to the $15,000 death benefit to the Grand Lodge.[6] See Gray 405 F. 3d at 235 (noting that

---

[6] In addition, the evidence shows that in January 2002, 280 of the $25,000 American Heritage policies had to be amended to reflect the Grand Lodge as the primary beneficiary receiving 60 percent of the death benefit, and the insured's designee as the irrevocable primary beneficiary receiving 40 percent. This change was prompted by an email from Gloria Giles, director of training at Atlanta Life, who testified that these policies contained errors because they did not correctly indicate the split benefit. Jayne Silven of American Heritage testified that any such errors would have been on the applications when they arrived at the insurance company, indicating that either the insurance agents or Atlanta Life were "erroneously" completing the applications. However, according to Postal Inspector Chris Davis' testimony regarding the spreadsheet he created of the insurance policies recovered from the Grand Lodge, as well as the spreadsheet itself (Government's Exhibit No. 74), there were approximately sixty $25,000 American Heritage policies that did not require an amendment even though they had the same or similar application dates as those policies that required the amendment. This would indicate that because some of the applications arrived at American Heritage with the "correct" 60/40 split benefit information and were not amended, there was no attempt to conceal the existence of $25,000 policies in which it was apparently known that the Grand Lodge would receive some benefit. The amendments that were made were more appropriately attributed to errors, as testified to by Jane Silven, to poor execution of the application by insurance agents or Atlanta

20

"common-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information"). Since the Government has failed to present substantial evidence of the Defendants having engaged in any misrepresentation or omission calculated to deceive the members, the Court concludes that considering the evidence presented in this case, even viewed in the light most favorable to the Government, the record does not contain substantial evidence to support the essential element of the existence of a scheme or artifice to defraud, as alleged by the Government. See Harvey, 532 F.3d 326 (noting that the Government must prove the existence of a scheme or artifice to defraud, and that the scheme or artifice involved a material misrepresentation or concealment of fact).

Nevertheless, having concluded that the Government has not presented substantial evidence of the existence of a scheme to defraud as alleged, the Court notes that Defendants also contend that the Government failed to present sufficient evidence of the specific intent to defraud as to any of the Defendants. In order to convict Defendants under the mail fraud statute, the Government is required to prove beyond a reasonable doubt that in devising or participating in the scheme as alleged, Defendants acted with the specific intent to defraud. See Ham, 998 F.2d at 1254 (noting that "the jury must find that a defendant acted with specific intent to defraud"). In this regard, the Government is required to prove that Defendants acted with the specific intent to deprive the Grand Lodge and its members of something of value by deceit or dishonest methods. See Coyle, 943 F.2d at 427 (noting that "the words 'to defraud'

---

Life.

commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching'") (internal quotation and citation omitted).

In this case, the Government's theory appeared to be that Defendants devised a scheme to defraud the Grand Lodge and its members, by crafting an insurance program that would benefit the Grand Lodge financially. As repeatedly argued by the Government, the ultimate object of the scheme was to inure funds to the Grand Lodge in the form of a $15,000 death benefit. In this regard, the Government contends that Defendants sought to deprive the Grand Lodge of the money that was used to supplement the insured members' premium payments, thereby ensuring the maintenance of the policy, so that in the event of the death of a member with a $25,000 policy, the Grand Lodge would gain a $15,000 death benefit. However, Defendants contend that the only evidence with regard to intent, is that of the Defendants' intent to create an insurance program that would inure to the benefit, and not the deprivation, of the Grand Lodge and its members. In this regard, the evidence presented established that Defendant Chambers initiated the Program with the aid of Defendant Souder and the support of Defendant Elliott, for the purpose of supplementing the Grand Lodge's benevolence program to provide a greater death benefit to each eligible member and to ultimately provide a death benefit for those members who otherwise were ineligible to participate in the benevolence program. The evidence is that Defendant Chambers intended that any residuals, cash values, or death benefits flowing from the insurance policies would be paid to the Grand Lodge to support the insurance program (i.e. the premiums paid out by the Grand Lodge), and

22

for other Grand Lodge expenditures in support of the Grand Lodge. The Government presented no evidence that any one of the Defendants used or intended to use the funds coming back to the Grand Lodge in any manner other than for the benefit of the Grand Lodge or its members. The only evidence upon which the Government could rely to show an intent to defraud would be inferences that a jury could draw based upon purported misrepresentations or omissions that might suggest that Defendants were acting with the intent to deceive or cheat the Grand Lodge and the members out of their money or property. However, as noted above, the Government failed to present substantial evidence, or any evidence in that regard, of any material misrepresentation or omission with regard to the Program upon which to base such an inference. See Grow, 394 F.2d at 199. The Court finds that since the evidence presented established that Defendants created the Program for the benefit of the Grand Lodge and its members in an effort to increase the value of the benevolence program for the sake of the Grand Lodge and its members, and not to deprive the Grand Lodge and its members of anything of value, there was no evidence presented that the Defendants acted with the specific intent to defraud. See Coyle, 943 F.2d at 427 (noting that to defraud means to wrong one in his property rights and usually signifies the deprivation of something of value). Therefore, in viewing the evidence presented in the case, even taken in the light most favorable to the Government, the record does not contain substantial evidence to support a jury finding that any of the Defendants acted with the specific intent to defraud the Grand Lodge and its members of something of value by deceit or dishonest methods. Having found that the Government has not presented substantial evidence as to the existence of a scheme or artifice to defraud, nor of

the specific intent to defraud as to any of the Defendants, the Court concludes that there is insufficient evidence in the record to sustain or support a conviction against the Defendants in case number 1:08CR136.

       ii.    Case 1:08CR275

With respect to case number 1:08CR275, the indictment alleges that in addition to the scheme or artifice to defraud the Grand Lodge and its members of money or property, as set out in 1:08CR136, the Defendants were also charged with "honest services" mail fraud in violation of 18 U.S.C. §§ 1341 and 1346.[7] The indictment charges that the scheme or artifice to defraud also sought to deprive the Grand Lodge and its members of the honest services of Defendant Chambers and Defendant Elliott, in the performance of acts related to their service as elected and salaried employees of the Grand Lodge, and the right of the Grand Lodge and its members to have the business of the Grand Lodge conducted honestly. In assessing whether there was substantial evidence in the record to support each of the essential elements of the offense of "honest services" mail fraud for which the Defendants have been convicted, the Court notes that in addition to the essential elements of mail fraud as discussed above, "honest services" mail fraud also requires the Government to prove elements that specifically relate to the deprivation of honest services.

In addition to proving the essential elements of mail fraud, that is, the existence of a scheme or artifice to defraud, the specific intent to defraud, and the use of the mails in execution thereof, in order to convict Defendants of "honest services" mail fraud, the Government "must

---

[7] Title 18 U.S.C. § 1346 provides that "a scheme or artifice to defraud includes a scheme or artifice to deprive another of the intangible right of honest services."

24

prove that the employee intended to breach a fiduciary duty, and that the employee foresaw or reasonably should have foreseen that his employer might suffer an economic harm as a result of the breach." United States v. Vinyard, 266 F.3d 320, 327 (4th Cir. 2001) (quoting United States v. Frost, 125 F.3d 346, 368 (6th Cir. 1997)). "Federal law governs the existence of fiduciary duty under the mail fraud statute. It is axiomatic that an employee has a fiduciary duty to protect the property of his employer." Frost, 125 F.3d at 366. Moreover, every employee has the fiduciary duty to provide honest and faithful services to his employer. See Vinyard, 266 F.3d at 326; United States v. Bereano, 1998 WL 553445, at *5 (4th. Cir. Aug. 28, 1998). With respect to economic harm, the "test neither requires an actual economic loss nor an intent to economically harm the employer." Vinyard, 266 F.3d at 329. Rather, "[u]nder this test, the employee need only intend to breach his fiduciary duty and reasonably foresee that the breach would create 'an identifiable economic risk' for the employer." Id. (citing United States v. Lemire, 720 F.2d 1327, 1337 (D.C. Cir. 1983) ("There must be a failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer.")). Finally, "[w]hether the risk materializes or not is irrelevant; the point is that the employee has no right to endanger the employer's financial health or jeopardize the employer's long-term prospects through self-dealing." Id. In this regard, the Court must, in addition to the other essential elements of mail fraud, assess whether there is sufficient evidence for the jury to find that either Defendant Chambers or Defendant Elliott breached his fiduciary duty to the Grand Lodge, and that either could reasonably foresee that the breach would create an identifiable economic risk to the Grand Lodge. Moreover, with regard to Defendant Souder,

25

the Court must assess whether there is sufficient evidence for the jury to find that Defendant Souder knowingly and willingly aided and participated in any breach of fiduciary duty by Defendant Chambers or Defendant Elliott, and that Defendant Souder could reasonably foresee that the breach would create an economic risk to the Grand Lodge.

With respect to their Rule 29 Motion as to case number 1:08CR275, Defendants renew their contention that the Government has failed to produce substantial evidence of the existence of a scheme or artifice to defraud, or of the specific intent to defraud as to any of the Defendants. The Government, however, contends that there is substantial evidence in the record that Defendants devised and participated in a scheme or artifice to defraud the Grand Lodge and its members by concealing information about the Program, and that by their deceit, Defendants deprived the Lodge and its members of the honest services of Defendants Chambers and Elliott.

At the outset, the Court notes that the Government was required to present substantial evidence as to the existence of a scheme or artifice to defraud and the specific intent to defraud regardless of whether the object of the scheme or artifice to defraud is money or property, or honest services. The Court further notes that the Government has alleged the same scheme or artifice to defraud in case number 1:08CR275 as it has in case number 1:08CR136, that is, a scheme or artifice to defraud the Grand Lodge and its members by creating a life insurance program that would provide members with a $10,000 death benefit, while concealing from the members that some would be eligible and insured for $25,000 split benefit policies with the Grand Lodge set to receive a $15,000 death benefit from the policy. In this regard, the Court

has already determined that with respect to case number 1:08CR136, the Government has not presented substantial evidence as to the existence of a scheme or artifice to defraud, nor of the specific intent to defraud as to any of the Defendants.  Because the schemes as alleged in both indictments are the same, and since the Court has determined that the Government has failed to present substantial evidence as to the existence of a scheme or artifice to defraud, or of the specific intent to defraud as to any of the Defendants, the Court concludes that there is insufficient evidence to sustain a conviction against Defendants in case number 1:08CR275 as to the "honest services" mail fraud charges.  Having concluded that there is insufficient evidence to support a conviction against the Defendants for "honest services" mail fraud because the Government has failed to present substantial evidence as to the underlying scheme or artifice to defraud, the Court will nevertheless address the parties contentions as they specifically relate to the "honest services" mail fraud charge.

Defendants contend that there is insufficient evidence to support a jury finding that Defendants Chambers or Elliott breached any fiduciary duty to the Grand Lodge and its members in its use of Grand Lodge funds for the Program, or that Defendant Souder aided and abetted the same.  The Government, however, contends that there is substantial evidence in the record that Defendants Chambers and Elliott breached their fiduciary duty to the Grand Lodge and its members when they used general operating funds, over and above the $3.00 per week originally pledged by the Grand Lodge, and benevolence funds to pay premiums for insured members in the Program.  With respect to the purported misuse of Grand Lodge funds, the Government has generally alleged that Defendants Chambers and Elliott were acting without

27

the consent of the membership. The evidence presented at trial by both the current leadership of the Masons, that is, Grand Master Milton Fitch, and that of Defendant Chambers, who was Grand Master during the relevant time period, was that the Grand Master is the Grand Lodge when the Grand Lodge is not in session. The evidence established that this designation meant that when the membership is not meeting in its annual Grand Lodge session, the Grand Master has all the decision-making capacity and authority as would the entire membership while in the Grand Lodge session, including the decision to expend Grand Lodge finances. In addition, during Defendant Chambers' tenure, the Grand Master was permitted to expend any amount of money without the approval of the Grand Lodge or other member of the leadership. Although Grand Master Fitch offered his opinion that benevolent funds should be held in trust and used only for the purpose of payment to a member's named beneficiary upon his death, the testimony of Defendant Chambers as well as that of other witnesses for the Government, was that benevolent funds had routinely been used in the past by the Grand Lodge for purposes other than to pay death benefits. The Court further notes from the evidence that no formal action was taken to separate benevolence funds or to place them in a separate trust-type account until 2004, during Grand Master Fitch's term of office. As to the status of Grand Lodge funds during the time period when the Program was in place, Postal Inspector Christopher Davis testified that after review of the Grand Lodge bank records, there was only one general operating account, and that there was no separate benevolence account. The Government's theory of a scheme to defraud is based in large measure on its reliance on the fact disclosed by Grand Master Fitch that when he assumed the office as Grand Master in October 2003, the

"account" for benevolent funds was empty. The Government would attribute this to the fact that checks signed by Defendants Chambers and Elliott were drawn on the Grand Lodge's general operating account to pay for premiums that were sent to American Heritage for policies issued under the Program.

In viewing the evidence in the light most favorable to the Government, the Court finds that it is reasonable to infer from the evidence that general operating funds and benevolent funds were placed in a common account and used to pay premiums for insured members participating in the Program from the Grand Lodge's general operating account. The Court further finds that based on the evidence, Defendant Chambers, as Grand Master, had the authority, acting as the Grand Lodge when it was not in session, to direct funds from the general operating account to make payments for the premiums of the insured members participating in the Program, even without the consent of the entire membership. While the Government suggests that to do so renders participation in the Program non-voluntary, in that non-insured member's benevolence funds were used to pay premiums for insured members, the Court finds that there was no such evidence presented as to any formal restriction placed on the use of benevolence funds, and that the formal designation of benevolence funds as "trust" funds did not occur until 2004. Thus, the Court finds that the record does not contain substantial evidence that in authorizing or making payment of premiums for insured members in the Program to American Heritage, Defendants Chambers and Elliott misused Grand Lodge funds, breached nor intended to breach, their fiduciary duty to the Grand Lodge. The Court further finds that since the record does not contain substantial evidence of a breach of fiduciary duty

29

on the part of Defendants Chambers or Elliott, Defendant Souder could not have aided and abetted any purported breach, and therefore the Government has failed to present substantial evidence that Defendant Souder aided and abetted any breach of fiduciary duty. Therefore, the Court concludes that considering the evidence in the light most favorable to the Government, there is insufficient evidence in the record to support a jury finding to sustain Defendants' convictions of "honest services" mail fraud.

Having so concluded, the Court nevertheless notes that with respect to Defendant Chambers, the Government presented evidence of nine payments in the form of personal checks and wire transfers from Defendant Wilcher to Defendant Chambers that were transferred during the period when the Program was in effect, presumably as evidence of kickbacks received in breach of Defendant Chambers' fiduciary duty to the Grand Lodge. With regard to one check for $3,500, the evidence established from Defendant Chambers' testimony is that the check was a repayment of a loan made to Defendant Wilcher for expenses related to the Program. With regard to the remaining eight payments, Defendant Chambers testified that the payments were for consulting services that he provided to Defendant Wilcher and the Wilcher Group for business activities related to the United Holiness Church, and unrelated to the Grand Lodge insurance Program. The Government, in turn, presented no further evidence to establish that the payments to Defendant Chambers were kickbacks. Specifically, there is no evidence that payments from Defendant Wilcher influenced Defendant Chambers' decisions with regard to the selection of Atlanta Life General Agency to administer the Program, nor with his decisions regarding the development or implementation of the Program. See, e.g., United

30

States v. Mauney, 129 Fed. Appx. 770, 775-776 (4th Cir. 2005) (employee's receipt of kickbacks affected price employer paid to vendors); see also Federal Jury Practice and Instructions, 5th Ed., § 47.03 ("A kickback includes any kind of undisclosed payment or reward to an employee for dealing in the course of employment with the person making the payment so that the employee's personal financial interest interferes with the employee's duty to secure the most favorable bargain for the employer."). In this regard, the Court finds that the record does not contain substantial evidence to support a jury finding that Defendant Chambers breached, or intended to breach, his fiduciary duty to the Grand Lodge by accepting purported kickbacks from Defendant Wilcher.[8]

Notwithstanding the Government's failure to present sufficient evidence of a breach of fiduciary duty on the part of the Defendants, even if the Government had presented sufficient evidence thereof, the Government was still required to also present substantial evidence that Defendants foresaw or reasonably should have foreseen that some economic harm would befall the Grand Lodge due to the alleged breach. In this case, the evidence shows that the premium amounts for the policies could only be determined after the potential insured member filled out

---

[8] The Court notes that Defendants contend that the jury verdict as to Defendant Chambers is inconsistent with that returned against Defendant Wilcher because Defendant Wilcher was acquitted on all charges under this indictment, and that the only evidence tying him to any scheme to deprive the Grand Lodge of the honest services of Defendants Chambers or Elliott are the checks made payable to Defendant Chambers. While Defendants concede that a purported inconsistent verdict cannot form the sole basis for a judgment of acquittal under Rule 23, Defendant contends that inconsistent verdicts suggest insufficient evidence to support a conviction of honest services mail fraud based on a kickback theory. Nevertheless, since the Court has concluded that there is insufficient evidence to support the jury verdict as to Defendant Chambers based upon his purported receipt of kickbacks, the Court need not address the purported inconsistency of verdicts identified by Defendants in ruling on Defendants' Rule 29 Motion.

31

the application and, if applicable, their health condition was assessed for the appropriate coverage. The evidence also established that the premium amounts for the older members (over 55 years) and those with health impairments were much more than the premiums for the younger, healthier members. Based on an average age of the membership of 55 years, Atlanta Life initially calculated that premiums would average $420.00 to $430.00 per year. With the insured member contributing $22.00 per month, or $264.00 per year, and the Grand Lodge contributing $3.00 per week, or $156.00 per year, the Grand Lodge expected that the Program would be cost-efficient. Moreover, the Program was set up to operate with the Grand Lodge paying varying proportions of the premiums for the three types of policies offered, with the expectation that the Grand Lodge would receive returns in the form of residuals, accumulated cash values, and death benefits of $15,000 from the $25,000 policies, to reinvest into the Program in order to make it financially self-sufficient. While it was communicated to Defendant Chambers that there was a risk that the $10,000 graded death benefit policies issued by Presidential Life might be more costly than $420.00 per year, the testimony from Jayne Silven was that if the Program went forward as expected in terms of the numbers of age-diverse applicants, the Program would have been very profitable for American Heritage and successful for the Grand Lodge with respect to their anticipated return on investment. However, in fact, what occurred was that more of the older members with health issues, who would be covered by higher premium policies, applied for policies, than the younger or healthier members who would be covered by policies with lower premium payments and $25,000 policies with a potential $15,000 in death benefits going to the Grand Lodge. As such, the resulting costs

caused the Program to be increasingly non-profitable for American Heritage, and expensive for the Grand Lodge, which is what neither American Heritage nor the Grand Lodge expected to occur.

In this regard, the Court finds that based on the evidence, Defendants Chambers and Souder believed from the outset that the Program was going to be financially successful for the Grand Lodge, and that their belief was reasonable in light of the facts presented. Thus, the Court finds that they did not foresee an economic harm to the Grand Lodge. The Court further finds that based on the evidence, no reasonable inference can be drawn from the evidence presented that Defendants reasonably should have foreseen that as a result of using Grand Lodge funds to pay premiums, the Grand Lodge would suffer an identifiable economic harm. See Vinyard, 266 F.3d at 329 (noting that the employee must "reasonably foresee that the breach would create 'an identifiable economic risk' for the employer"). The Government, however, contends that the premium payments required for the insurance Program depleted the Grand Lodge's general operating account, which thereby caused the Grand Lodge to have to borrow money in October 2002 and April 2003. However, the evidence established that it was a necessary and regular occurrence for the Grand Lodge to take out loans during the "lean period" between October and May to support the general operation of the Grand Lodge due to members and local lodges not sufficiently or timely paying their annual dues and assessments. Nevertheless, although an actual loss is not required, the Government still failed to present substantial evidence of an intent by the Defendants to breach a fiduciary duty and that they could reasonably foresee that such a breach, if any existed, would result in economic harm to

33

the Grand Lodge.  See id. at 329 (noting that "[w]hether the risk materializes or not is irrelevant; the point is that the employee has no right to endanger the employer's financial health or jeopardize the employer's long-term prospects through self-dealing").  Having found that the Government has failed to present substantial evidence of the existence of a scheme or artifice to defraud, or that any of the Defendants acted with the specific intent to defraud, or that Defendants Chambers or Elliott breached their fiduciary duty to the Grand Lodge, and that either Defendant Chambers or Elliott foresaw or reasonably should have foreseen that the Grand Lodge would suffer some economic harm as a result of any purported breach, or that Defendant Souder aided and abetted the same, the Court concludes that there is insufficient evidence to sustain the convictions against the Defendants for "honest services" mail fraud in case number 1:08CR275.  Therefore, having concluded that there is insufficient evidence to support the verdicts in case number 1:08CR136 or in case number 1:08CR275, the Court will grant each Defendants' Rule 29 Motion for acquittal.

III.    RULE 33 MOTION

Having determined that Defendants' Rule 29 Motion for acquittal will be granted, the Court notes that pursuant to Rule 29, "[i]f the court enters a judgement of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed.R.Crim.P. 29(d)(1).  In making such a determination, "[t]he court must specify the reasons for that determination." Id. Therefore the Court turns to the Rule 33 standard for a new trial.

A.   Legal Standard

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). When the motion attacks the weight of the evidence, the court's authority under Rule 33 is broader than that under Rule 29 such that "[i]n deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses." United States v. Arrington, 757 F.2d 1484, 1485 (4th Cir. 1985). However, under this standard, a district court "should exercise its discretion to grant a new trial sparingly, and . . . should do so only when the evidence weighs heavily against the verdict." United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003).

B.   Analysis

In this case, Defendants contend that a new trial is warranted 1) in the interest of justice, due to the Court's error in failing to give Defendants Chambers and Elliott's jury instructions as to certain aspects of "honest services" mail fraud; and 2) because the verdicts are against the weight of the evidence, particularly as to any proof of criminal intent or criminal conduct. The Court will address each of Defendants' contentions in turn.

Defendants Chambers and Elliott argue that their proposed jury instruction number three titled "Fiduciary and Breach of Fiduciary Duty Defined" should have been accepted and read to the jury because it was fundamental to Defendant Chambers' right to a fair trial and his right to present a defense. The standard of review for jury instructions in this Circuit is whether the jury instructions, in their entirety and as part of the whole trial, "adequately instructed the jury

on the elements of the offense and the accused's defenses." United States v. Bostian, 59 F.3d 474, 480 (4th Cir. 1995). Moreover, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L. Ed. 2d 54 (1988).

At the outset, the Court notes that the substance of the instructions given by the Court relating to "fiduciary duty" are substantially similar to those as proposed by Defendants. In this regard, Defendants requested that the Court include the following additional language that was omitted from the Court's instructions: "The issue of whether Marvin D. Chambers, Sr., and Alvin Lewis Elliott had fiduciary duties with the Prince Hall Lodge, and if so, the scope of each individual's fiduciary duty, are facts for you to decide based upon all of the evidence before you regarding the relationship between Marvin D. Chambers, Sr., and Alvin Lewis Elliott and the Prince Hall Lodge." The Court notes, however, that this instruction is not a correct statement of the law. The correct statement of law, which was given by the Court in its instructions with regard to a defendant's fiduciary duty is as follows: "Federal law governs the existence of fiduciary duty under the mail fraud statute. It is axiomatic that an employee has a fiduciary duty to protect the property of his employer." Frost, 125 F.3d at 366. Moreover, every employee has the fiduciary duty to provide honest and faithful services to his employer. See Vinyard, 266 F.3d at 326. In this regard, the Court finds that it did not err in declining to give the requested portion of Defendants' proposed instructions, which was not a correct statement of law. In addition, Defendants' proposed instructions state: "While formal job descriptions assist in determining the nature and scope of fiduciary duties, the day-to-day course of conduct,

36

understanding and agreements between the Prince Hall Lodge and Marvin D. Chambers, Sr. and Alvin Lewis Elliott are also relevant and are before you for consideration. Under Masonic law, a Grand Master and Grand Secretary must both carry out their duties "faithfully."" The Court notes that Defendants' proposed instruction regarding Masonic law and what specific facts the jury may consider in determining whether Defendants breached their fiduciary duty to the Grand Lodge, is not a recognized defense to mail fraud, as suggested by Defendants. See Mathews, 485 U.S. at 63, 108 S. Ct. at 883 (noting that "a defendant is entitled to an instruction as to any *recognized* defense for which there exists evidence sufficient for a reasonable jury to find in his favor")(emphasis added); see also, United States v. Holland, 2009 WL 1507146, at *11 (W.D. Va. May 29, 2009) (declining to give defendant's proposed instruction because it was not a recognized defense for the offense charged). The Court finds that any concerns with regard to what the jury may consider were adequately addressed by the Court's instructions defining "evidence" and "fiduciary duty." The Court further finds that the jury was given careful and adequate instruction as to each element of the offense of mail fraud, as well as to the distinct elements of "honest services" mail fraud, and instructed to make its decision based on the evidence presented at trial, and as such, the jury was adequately instructed. See Bostian, 59 F.3d at 480 (denying defendant's objection to the lower court's instructions where the court "adequately instructed the jury on the elements of the offense" in view of the jury instructions "in their entirety and as part of the whole trial"). Therefore, having concluded that the jury instructions were adequate in this case, the Court declines to grant Defendants a new trial in the interest of justice on the ground that the Court erred in instructing the jury as to "honest

services" mail fraud.

However, Defendants further contend that a new trial is warranted because the verdicts returned in this case are against the weight of the evidence, particularly as to the Government's proof of criminal intent or criminal conduct. As demonstrated in the preceding discussions in which the Court granted Defendants' Motion for acquittal, the Court found that, even viewing the evidence in the light most favorable to the Government, the Government did not present substantial evidence as to the existence of a scheme or artifice to defraud, nor of the specific intent to defraud as to any of the Defendants, and therefore, there was insufficient evidence to sustain convictions against the Defendants in either case number 1:08CR136 or 1:08CR275. In considering the Court's previous findings, and in light of the Rule 33 standard, wherein the Court must determine whether the evidence weighs heavily against the verdicts, the Court finds that the failure of the Government to present evidence to carry its burden of proof beyond a reasonable doubt is even more apparent.

In this case, as noted above, the Government failed to present substantial evidence, or any evidence for that matter, of any material misrepresentation or omission made by Defendants with regard to or in furtherance of a scheme to defraud the Grand Lodge and its members by concealing the fact that the Grand Lodge would receive a $15,000 death benefit from any insured member's $25,000 policy. Specifically, the Government did not present evidence of any material misrepresentation, and its evidence with regard to material omissions was based on the recollections of Masons who attended meetings regarding the North Carolina Mason Supplemental Insurance Program, some of whom testified to having knowledge of the very facts

38

that the Government contends the Defendants materially omitted or concealed. Moreover, the Defendants offered the testimony of four other Masons that also testified to having knowledge of the facts that the Government contends the Defendants concealed from the membership. In addition, the evidence established that the existence of the $25,000 policies and the split benefit provision was communicated to the agents in a distribution of the Letter of Intent sent by American Heritage to Atlanta Life, and in the training session held on June 10, 2002. Most importantly, the Court finds that there was no evidence that any of the Defendants directed any of the agents or the district deputies or other Masons charged with disseminating information about the Program to conceal information about the insurance Program. It is also significant that the Riders that were attached to the $25,000 policies and signed by the applicants were further acknowledgment that insurance coverage in the amount of $25,000 was the minimum policy amount that such a Rider could be attached to. Such a disclosure provided further evidence that Defendants did not devise a scheme to conceal the $25,000 policies with the split death benefit provision.

Furthermore, with respect to the required specific intent element, the Court finds that the Government presented no evidence to support a jury finding that any of the Defendants acted with the specific intent to defraud the Grand Lodge and its members of something of value. The evidence presented demonstrated that the intent of the Defendants was to provide a benevolent death benefit of $10,000 to all of the Grand Lodge members at a minimal cost through an insurance program that would ultimately provide financial returns to the Grand Lodge. As envisioned, this would have allowed the Grand Lodge to support the increased

benefit to the members at a minimal cost. From the inception of the Program, the intent of the Defendants was that the Grand Lodge would receive a "return" on its investment, that is, its portion of the premiums it paid for each insured member, in the form of residuals and accumulated cash value. This very fact was communicated at the first meeting on May 25, 2002, where the Program was introduced to the members. Merely because the Program evolved with the addition of the American Heritage $25,000 policies to include another form of "return" to the Grand Lodge, that is, the $15,000 death benefit, was not evidence that the Grand Lodge or Defendants Chambers or Elliot intended to deceive or cheat the Grand Lodge members in order to gain something of value for the Grand Lodge. Specifically, the Court finds that there was no evidence of a specific intent to defraud with respect to the Defendants in this case. Therefore, in addition to the reasons stated for granting Defendants' Motion for acquittal, the Court finds that the lack of evidence in this case against Defendants as to the existence of a scheme or artifice to defraud and the lack of evidence of a specific intent to defraud by Defendants, weighs heavily against the jury's return of guilty verdicts against the Defendants. See Perry, 335 F.3d at 320 (finding that a court should only grant a new trial when "the evidence weighs heavily against the verdict"). Having concluded that the evidence as presented or the lack thereof weights heavily against the guilty verdicts in this case, the Court will conditionally grant Defendants' Rule 33 Motion for a New Trial.

IV.    CONCLUSION

For the reasons set forth herein, accordingly IT IS THEREFORE ORDERED that Defendants' Joint Motion for Judgment of Acquittal [1:08CR136: Doc. #88; 1:08CR275: Doc. #112] is hereby GRANTED.   IT IS FURTHER ORDERED that Defendants are hereby ACQUITTED of all counts in the Indictments in case number 1:08CR136 and 1:08CR275.

IT IS FURTHER ORDERED that, conditionally, Defendants' Motion for a New Trial [1:08CR136: Doc. #88; 1:08CR275: Doc. #112] is hereby GRANTED.

An Order and Judgment consistent with this Memorandum Opinion will be filed contemporaneously herewith.

This, the 16th day of October, 2009.

United States District Judge

41